593 S.E.2d 170

ELECTRO–LAB OF AIKEN, INC., Appellant,

v.

SHARP CONSTRUCTION CO. OF SUMTER, INC., Respondent.

No. 3731.

Court of Appeals of South Carolina.

Heard Dec. 9, 2003.

Decided Feb. 2, 2004.

364

Robert J. Harte and David W. Miller, of Aiken, for Appellant.

Thomas B. Jackson, III, of Columbia, for Respondent.

HEARN, C.J.:

Electro–Lab of Aiken asserts that Sharp Construction Company breached the parties' contract by replacing Electro–Lab with a different subcontractor. The parties became contractually bound, Electro–Lab argues, by virtue of Sharp's use of Electro–Lab's subcontracting bid in its general contracting bid and by certain acts following the use of the bid. The trial court disagreed, concluding that no contract existed between the parties. We affirm.

## FACTS

On April 24, 1997, bidding closed for all general contractors on two projects to build schools in York County, South Car-

olina. Before the bid deadline, Sharp Construction Co., a general contractor, received an oral bid by telephone from Electro–Lab pertaining to one of the school projects' electrical work. Electro–Lab's bid amount was $1,150,000. Sharp listed Electro–Lab in its overall general contractor's bid submitted to the project's owner. Sharp alleges this inclusion was actually a mistake because it had inadvertently overlooked a lower bid from another electrical subcontractor, Ind–Com Electric Company, Inc. for $1,140,000. However, this oversight was not discovered until after Sharp submitted its general contractor's bid. At the time Sharp submitted its general contractor's bid, the only information it had about Electro–Lab's bid was the dollar amount.

Sharp, as the low bidder for the project, was awarded the general contract and was required to provide payment and performance bonds. When Electro–Lab contacted Sharp to inquire about the project, Sharp notified Electro–Lab that its bid was the lowest and that it was listed as the electrical subcontractor in Sharp's successful bid. Sharp's project manager testified that during this telephone conversation, he told Electro–Lab that he would like to know what its bond rate was and asked Electro–Lab to fax its bid in writing. Shortly thereafter, Sharp discovered that Electro–Lab's subcontract bid was not the lowest bid received, and asked Electro–Lab if it could perform the work for $1,140,000. Electro–Lab agreed, and Sharp submitted the following confirmatory fax:

Dear Michael:

This letter is to confirm that we will be issuing a subcontract for the electrical work on the above referenced project for $1,140,000.00.

Please proceed immediately with having shop drawing completed and performance and payment bonds issued. A subcontract is forthcoming. We look forward to working with you.

Sincerely,

SHARP CONSTRUCTION CO.

OF SUMTER, INC.

HAL TURNER

Following receipt of this letter, Electro–Lab attended a preconstruction conference at Sharp's request and began gather-

ing submittals for the project from suppliers. Approximately six weeks after bidding closed on the project, Electro–Lab informed Sharp that it had been unable to obtain the required bonds. According to Sharp, during this telephone conversation Electro–Lab requested that its name be withdrawn from further consideration as the electrical subcontractor for the project. Electro–Lab disputes this, maintaining that it never requested to be withdrawn from consideration.

After Electro–Lab informed Sharp that it could not obtain the bonds, Sharp entered into a subcontract for the same dollar amount with Ind Com, which provided payment and performance bonds as required. By letter, Sharp confirmed that it would be switching to a different electrical subcontractor because of Electro–Lab's inability to obtain bonding.

Electro–Lab did not protest the change until nine months later when it initiated the instant lawsuit, alleging that Sharp breached their contract by switching the subcontract for the project's electrical work to Ind–Com. After a full trial on the merits, the trial judge ruled in favor of Sharp, determining that no contract existed between the parties and that Electro–Lab's proof of damages was legally insufficient.

## STANDARD OF REVIEW

An action for breach of contract is an action at law. *Auto Owners Ins. Co. v. Langford,* 330 S.C. 578, 581, 500 S.E.2d 496, 497 (Ct.App.1998) (citation omitted). In an action at law, on appeal of a case tried without a jury, the appellate court's standard of review extends only to the correction of errors of law. *Okatie River, L.L.C. v. Southeastern Site Prep, L.L.C.,* 353 S.C. 327, 334, 577 S.E.2d 468, 472 (Ct.App.2003) (citation omitted). The trial judge's findings of fact will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings. *King v. PYA/Monarch, Inc.,* 317 S.C. 385, 388, 453 S.E.2d 885, 888 (1995) (citation omitted).

## ISSUES

1. Did the trial court err when it found no contract existed between the parties?
2. Did the trial court err when it found that Electro–Lab's proof of damages was legally insufficient?

## LAW/ANALYSIS

Electro–Lab argues a contract existed between the parties by virtue of the use of Electro–Lab's bid in Sharp's successful general contracting bid, the parties' subsequent communications, and Electro–Lab's attendance at a pre-construction meeting and its gathering of submittals from suppliers. We disagree.

 "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Regions Bank v. Schmauch*, 354 S.C. 648, 660, 582 S.E.2d 432, 439 (Ct.App.2003) (citations omitted). The necessary elements of a contract are offer, acceptance, and valuable consideration. *Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.*, 313 S.C. 215, 220, 437 S.E.2d 122, 125 (Ct.App.1993). In this case, there was a valid oral offer to perform electrical subcontract work for $1,150,000 based on the telephone bid received by Sharp before Sharp furnished its general contractor's bid to the project owner. *See id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)) (" 'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' "). *See also Klose v. Sequoia Union High Sch. Dist.*, 118 Cal.App.2d 636, 258 P.2d 515, 517 (1953) ("A subcontractor bidder merely makes an offer that is converted into a contract by a regularly communicated acceptance conveyed to him by the general contractor."). As a result, the issue in this case turns on whether Sharp's conduct following Electro–Lab's bid amounted to acceptance of Electro–Lab's offer.

Jurisdictions outside of South Carolina have consistently held that a general contractor's use of a subcontractor's bid is not an acceptance that creates a contractual relationship between the general contractor and the subcontractor should the general contractor become the successful bidder. *See, e.g., Elec. Constr. & Maint. Co. v. Maeda Pac. Corp.*, 764 F.2d 619, 621 (9th Cir.1985); *Merritt–Chapman & Scott Corp. v. Gunderson Bros. Eng'g Corp.*, 305 F.2d 659, 663 (9th Cir.1962); *Williams v. Favret*, 161 F.2d 822, 824 (5th Cir.1947); *Finney Co. v. Monarch Constr. Co.*, 670 S.W.2d 857, 859 (Ky.1984);

*Holman Erection Co. v. Orville E. Madsen & Sons, Inc.,* 330 N.W.2d 693, 696 (Minn.1983); *Mitchell v. Siqueiros,* 99 Idaho 396, 582 P.2d 1074, 1077 (1978); *Corbin Dykes ·Elec. Co. v. Burr,* 18 Ariz.App. 101, 500 P.2d 632, 634 (1972); *K.L. House Constr. Co. v. Watson,* 84 N.M. 783, 508 P.2d 592, 593 (N.M. 1973); *Neptune Gunite Co. v. Monroe Enters., Inc.,* 229 Cal.App.2d 439, 40 Cal.Rptr. 367, 371 (1964); *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.,* 49 Wash.2d 363, 301 P.2d 759, 763 (1956).

 In accordance with these jurisdictions and based on general contract law principles, we agree that a general contractor's mere use of a subcontractor's bid in a general contractor's successful overall bid does not constitute acceptance of an offer. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." RESTATEMENT (SECOND) OF CONTRACTS § 50 (1981). A typical contract contains mutual promises and is created by an acceptance constituting a return promise by the offeree. *See* RESTATEMENT (SECOND) OF CONTRACTS § 50 cmt. c (1981); *Sauner v. Pub. Serv. Auth.,* 354 S.C. 397, 405, 581 S.E.2d 161, 166 (2003) ("A bilateral contract . . . exists when both parties exchange mutual promises."). Moreover, a contract only arises when there is an actual agreement by the parties in which the parties demonstrate a mutual intent to be bound. *Timmons v. McCutcheon,* 284 S.C. 4, 9–10, 324 S.E.2d 319, 322 (Ct.App.1984). Sharp's mere use of Electro–Lab's subcontractor's bid in its overall bid falls short of manifesting any assent to the terms of the bid or the required mutual intent to be bound. As a consequence, no contract existed between the parties by virtue of Sharp's use of Electro–Lab's bid.

 Electro–Lab argues that even if the use of a bid by a general contractor from a subcontractor does not necessarily form a contract, such use is indicative of the formation of a contract between the two companies. Electro–Lab asserts, based on the totality of circumstances, that the culmination of Sharp's and Electro–Lab's actions formed an enforceable contract. We disagree. Following Sharp's use of Electro–Lab's bid, Sharp's project manager testified that he told Electro–Lab that its bid was low, inquired about Electro–Lab's bond rate and asked Electro–Lab to fax its bid in

writing. This communication falls short of amounting to acceptance of the bid because it does not convey any assent to the terms of the bid by a return promise or any mutual intent to be bound. Such communications were merely preliminary negotiations between the parties and do not amount to an enforceable contact. *See McLaurin v. Hamer*, 165 S.C. 411, 420, 164 S.E. 2, 5 (1932) (stating that there is no meeting of the minds between the parties when they are merely negotiating the terms of an agreement to be entered into). Similarly, Sharp's discussions with Electro–Lab about performing the work for the $1,140,000 were also preliminary negotiations as evidenced by Sharp's confirmatory fax instructing Electro–Lab that "[a] subcontract is forthcoming." *See Caulder v. Knox*, 251 S.C. 337, 345, 162 S.E.2d 262, 266 (1968) ("The intention of the parties should be determined from the surrounding circumstances, as well as from the testimony of all witnesses; and subsequent acts are relevant to show whether a contract was intended."). *See also Bugg v. Bugg*, 272 S.C. 122, 125, 249 S.E.2d 505, 507 (1978) ("Where it is determined that the parties intended not to be bound until the written contract is executed, no valid and enforceable obligation will be held to arise."). Under the totality of the circumstances, the culmination of Sharp's actions does not evidence any assent to the terms of the Electro–Lab's bid or a mutual intent to be bound. Further, we do not find Electro–Lab, in attending the pre-construction meeting and gathering submittals, established a mutual intent to be bound or any acceptance by Sharp. As a result, we find the conduct of Sharp and Electro–Lab following the bid did not amount to acceptance of Electro–Lab's bid and did not create an enforceable contract.

 Electro–Lab also asserts that principles of mutuality of contract require we find the parties bound in contract. We do not find the principles of mutuality of contract to be invoked under these circumstances. In support of this argument, Electro–Lab relies on *Powers Constr. Co. v. Salem Carpets, Inc.*, 283 S.C. 302, 322 S.E.2d 30 (Ct.App.1984). This case noted the doctrine of promissory estoppel could support an action by a contractor who has submitted a prime bid in reliance upon a subcontractor's bid. *Id.* at 306, 322 S.E.2d at 33. Electro–Lab argues because, pursuant to *Powers*, a subcontractor could be liable for damages under the doctrine of

promissory estoppel, principles of mutuality of contract require a general contractor to be bound to a subcontract, or in this case, Sharp to be bound to Electro–Lab. Electro–Lab's argument, however, is flawed for two significant reasons. First, the *Powers* case is premised on the doctrine of promissory estoppel and not breach of contract as asserted by Electro–Lab on appeal. Second, principles of mutuality of contract only arise between parties to a contract. Because we find no enforceable contract existed, the principles of mutuality of contract are neither invoked nor violated.

Because we agree with the conclusion of the trial court that no enforceable contract existed between the parties, we need not reach Electro–Lab's argument concerning the sufficiency of damages. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling that an appellate court need not review remaining issues when disposition of prior issues are dispositive). Accordingly, the trial court's decision is

**AFFIRMED.**

HOWARD and KITTRIDGE, JJ., concur.